UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BP PRODUCTS NORTH AMERICA INC.,

                    Plaintiff,

          - against -

EXXONMOBIL CORPORATION,

                  Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-3288 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

      This case arises out of a long-running dispute between Plaintiff BP Products North America Inc. ("BP") and Defendant ExxonMobil Corporation ("ExxonMobil") regarding liability for, and remediation of, an oil spill contamination in Greenpoint, a mixed-use neighborhood in Brooklyn, New York.  The contamination was identified by the United States Coast Guard back in 1978.  Over forty years later, BP and ExxonMobil still dispute responsibility for the contamination and remediation, while the residents and businesses in Greenpoint continue to suffer harm from the oil spill, with no remediation in sight.  The present iteration of the parties' disagreement is far removed from addressing the contamination itself: the parties dispute responsibility for approximately $4.4 million in fees and costs incurred by BP in defending itself against certain third-party actions brought by Greenpoint residents and businesses.  Currently before the Court are parties' cross-motions for summary judgment.  For the reasons stated herein, the parties' cross-motions are granted in part and denied in part.

## BACKGROUND

The following facts, taken from the parties' Local Civil Rule 56.1 statements[1] and relevant parts of the summary judgment record, are undisputed unless otherwise noted.

### I.     History of the Parties' Relationship

### A.      The BP Terminal

Prior to 1968, ExxonMobil's predecessor, Mobil Oil Corporation ("Mobil"), owned and operated a petroleum refinery facility on its property in Greenpoint, Brooklyn.  (Plaintiff's Rule 56.1 Statement ("Pl. 56.1"), Dkt. 37-2, ¶¶ 1–3.)  In 1968, BP's predecessor, Amoco Oil Company ("Amoco"), together with Cities Service Oil Company ("Citgo"), purchased "an approximately 10[-]acre parcel" of Mobil's Greenpoint property located "by Apollo Street and Norman Avenue" (the "BP Terminal").  (*Id.* ¶ 5.)  Mobil retained part "of the refinery property which it used as a petroleum bulk storage and distribution terminal" (the "ExxonMobil Terminal").  (*Id.* ¶ 4.)  In 1970, Amoco purchased Citgo's interest and became the sole owner of the BP Terminal, which it used "as a storage and distribution" facility "for retail petroleum products."  (*Id.* ¶ 5.)

In 1978, the Coast Guard, upon observing "a concentration of oil on Newtown Creek and determin[ing] that it was seeping from the bulkhead by Meeker Avenue," "retained an environmental consulting firm, Geraghty & Miller, Inc. [('G&M')], to investigate the nature and extent of sub-surface oil products in the area."  (*Id.* ¶ 6.)  In July 1979, G&M issued a report of its findings (the "G&M Report"), in which it found environmental contamination in Greenpoint (the

---

[1] Pursuant to Local Civil Rule 56.1(d), "[e]ach statement by the movant or opponent pursuant to [a summary judgment motion], including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  To the extent "the record does not support certain critical assertions" in the parties' 56.1 statements, the Court has disregarded those unsupported assertions. *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003).

"Greenpoint Contamination") and that the BP Terminal was "not the source of the spill . . . and does not handle the type of product found in the subsurface." (*Id.* ¶ 9; G&M Report, Dkt. 37-4, Executive Summary ¶ 22.)  The G&M Report further found that a "former Mobil refinery shut down in 1965 and demolished in 1968 occupied the present Amoco [*i.e.*, the BP Terminal] site and adjacent properties" and, "[b]ased on the physical characteristics of the spill, age of the product, and its chemical characteristics," G&M "concluded that the source of the product is the former Mobil refinery." (Pl. 56.1, Dkt. 37-2, ¶ 9; G&M Report, Dkt. 37-4, Executive Summary ¶¶ 24, 27.)

**B.    The Parties' 1993 and 2004 Settlement Agreements**

In the aftermath of G&M's findings regarding the Greenpoint Contamination, Amoco and Mobil disputed responsibility regarding the Greenpoint Contamination and, to resolve this dispute, entered into a settlement agreement in May 1993 (the "1993 Agreement"). (Pl. 56.1, Dkt. 37-2, ¶ 13.)  Under the 1993 Agreement, Amoco and Mobil agreed to "resolve all existing disagreements over responsibility and allocate liability for environmental contamination (including, among other things, third party personal injury and property damage claims)" in connection with, among other things, the Greenpoint Contamination.[2]  (1993 Agreement, Dkt. 36-4, at 2.)

Pursuant to the 1993 Agreement, Amoco paid $1 million to Mobil in exchange for Mobil's (1) waiver and release of Amoco "from any and all claims that Mobil has or may in the future have against Amoco relating in any way to environmental contamination associated with the Greenpoint Contamination or any other dissolved substances associated with the liquid plume which are not physically located under" the BP Terminal (1993 Agreement, Dkt. 36-4, § IV(A)–(B)); and (2)

---

[2] The 1993 Agreement "also resolved unrelated issues between the two companies concerning sites in Illinois and in New England." (Pl. 56.1, Dkt. 37-2, ¶ 13.)

agreement "to defend, indemnify, and hold harmless Amoco . . . from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees) asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume which are not physically located under" the BP Terminal (*id.* § IV(C)).  The 1993 Agreement is binding upon BP and ExxonMobil as "the successors and assigns" of Amoco and Mobil, respectively.  (*See* Pl. 56.1, Dkt. 37-2, ¶ 18.)

Following the parties' entry into the 1993 Agreement, Amoco concluded "that sub-surface petroleum products attributable to the Mobil plume were continuing to migrate through the sub-surface under the" BP Terminal.  (*Id.* ¶ 19.)  Thus, in 1999, "Amoco brought a lawsuit in Illinois federal court seeking a declaratory judgment and damages for breach of the 1993 Agreement" against Mobil, which, in turn, asserted a counterclaim for breach of the 1993 Agreement (the "1999 Action").  (*Id.* ¶ 20; Defendant's Rule 56.1 Statement ("Def. 56.1"), Dkt. 36-1, ¶ 4.)  Mobil removed the action to this District.  (Pl. 56.1, Dkt. 37-2, ¶ 20; *see Amoco Oil Co. v. Mobil Oil Co.*, No. 00-CV-2228 (SJF) (JXA) (E.D.N.Y. Apr. 14, 2000).)

In February 2004, BP, as the successor to Amoco, and ExxonMobil, previously known as Mobil, entered into a settlement agreement to resolve the 1999 Action (the "2004 Agreement").  (Pl. 56.1, Dkt. 37-2, ¶ 21.)  Under the 2004 Agreement, the parties each agreed to "maintain hydraulic control" on the southern and western boundaries of the BP Terminal, respectively, "to prevent petroleum products 'from migrating in the future'" to and from the BP Terminal.  (*Id.* ¶¶ 21–22.)  The 2004 Agreement also contained mutual releases.  In relevant part, BP "remise[d], release[d], and forever discharge[d]" ExxonMobil "of and from any and all manner of action and

cause of action, . . . claims and demands whatsoever, . . . whether known or unknown, which against [ExxonMobil], [BP] ever had or now have relating to (1) the claims made in the [1999 Action], including without limitation, claims relating to the alleged migration of Products onto BP's Property, and (2) responsibility for remediating contamination at the Greenpoint Area[3].]" (2004 Agreement, Dkt. 36-5, § 6(b); Def. 56.1, Dkt. 36-1, ¶ 6; Defendant's Opposition to Plaintiff's Rule 56.1 Statement ("Def. 56.1 Opp."), Dkt. 36-16, ¶ 23.)  The 2004 Agreement also provided that, "[e]xcept where amended by this Agreement, the 1993 Agreement shall remain in full force and effect."  (2004 Agreement, Dkt. 36-5, § 8; Def. 56.1, Dkt. 36-1, ¶ 7.)

## II.   The Greenpoint Contamination Litigation

### A.   The *Baumbach* and *Spiroff* Actions

In October 2005 and April 2006, groups of Greenpoint, Brooklyn residents, property owners, and occupants brought lawsuits against, among others, ExxonMobil and BP for "negligent, willful, and/or wanton actions" that caused the spill of "millions of gallons of oil and oil products . . . into the ground" and for failure "to remove the contamination which migrated and continues to migrate onto plaintiffs' properties causing plaintiffs to suffer ongoing injury and damages to their persons and properties."  (*Baumbach et al. v. ExxonMobil et al*. (the "*Baumbach* Action") Fifth Amended Complaint ("Baumbach Fifth Am. Cmpl."), Dkt. 36-6, ¶¶ 1–2; Pl. 56.1, Dkt. 37-2, ¶ 25; Def. 56.1, Dkt. 36-1, ¶ 8; *Spiroff v. ExxonMobil Corp. et al.* (the "*Spiroff* Action"[4]

---

[3] The 2004 Agreement defines the "Greenpoint Area" as including the BP Terminal, the Mobil Terminal, "the areas where ExxonMobil formerly had its refinery operations, Newtown Creek, and areas adjacent to these areas where ExxonMobil is performing or may in the future perform remediation work."  (2004 Agreement, Dkt. 36-5, § 1.1.)

[4] The *Spiroff* Action is one of "[t]wenty-two other lawsuits on behalf of over 300 Plaintiffs" that were "brought by the then New York law firm of Napoli Bern Ripka in New York State Supreme Court, Kings County against" ExxonMobil, BP, "and other companies (collectively, the 'Napoli lawsuits')."  (Pl. 56.1, Dkt. 37-2, ¶ 30.)  "The Napoli lawsuits all contained allegations similar to" the *Baumbach* Action.  (*Id.*)  Just like the *Baumbach* Action, the Napoli lawsuits "relied

and, together with the *Baumbach* Action, the "Greenpoint Contamination Litigation"), Fifth

Amended Complaint ("Spiroff Fifth Am. Cmpl."), Dkt. 35-7, ¶¶ 1–2; Def. 56.1, Dkt. 36-1, ¶ 9.)[5]

 The plaintiffs in the Greenpoint Contamination Litigation relied on the 1979 G&M Report

in alleging that (1) the Greenpoint Contamination resulted in millions of gallons of plume of oil

and oil products ("Plume"), (2) "the spill likely migrated and would continue to migrate with

groundwater and by following underground conduits," and (3) "the majority of the spill most likely

originated either at" the ExxonMobil Terminal or BP Terminal.   (Baumbach Fifth Am. Cmpl.,

Dkt. 36-6, ¶¶ 411–13; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 41–43.)   The complaints further

alleged that, "[i]n the decade that followed the 1979 [G&M Report]," BP and ExxonMobil took

"little action, if any, . . . to eliminate, correct, and or remedy the [Plume] or prevent its continued

migration," which resulted in permanent and continuing harm to the plaintiffs.  (Baumbach Fifth

Am. Cmpl., Dkt. 36-6, ¶¶ 416–22; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 46–58.)  The plaintiffs

sought costs for medical and property injuries, and injunctive relief for remediation.  (Baumbach

Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 437–39; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 77–79.)

---

upon the [G&M] Report regarding the source of contamination in Greenpoint," and "cited to the
[G&M] Report's findings" regarding the extent of the oil spill and the conclusion that the spill
"'most likely originated' at the" ExxonMobil Terminal and BP Terminal." (*Id.*)  Accordingly,
given the similarities between the lawsuits and the parties' focus on the *Spiroff* Action among the
Napoli lawsuits, the Court's discussion of the *Spiroff* Action throughout this Memorandum and
Order, unless otherwise indicated, encompasses the Napoli lawsuits.

 [5] The Court derives the facts regarding the *Baumbach* and *Spiroff* Actions from the fifth
amended complaints in those actions, filed by ExxonMobil in support of its motion for summary
judgment.  *See Taub v. Schon*, 51 N.Y.S. 3d 132, 133 (App. Div. 2017) ("The amended complaint
takes the place of the original pleading" and "therefore become[s] the operative complaint."
(internal quotation marks and citations omitted).)  Moreover, although BP attaches the earlier
complaints from each action to its motion for summary judgment (*see* Dkts. 37-9, 37-12), BP does
not dispute ExxonMobil's reliance on the amended complaints and itself cites to the fifth amended
complaint in the *Baumbach* Action in its responsive papers.  (*See* Plaintiff's Opposition to
Defendant's Rule 56.1 Statement ("Pl. 56.1 Opp."), Dkt. 38-1, ¶¶ 8, 10; Plaintiff's Reply in
Support of Its Motion to Dismiss ("Pl. Reply"), Dkt. 39, at 1–2.)

**B.      Disagreement Regarding ExxonMobil's Duty to Defend and Indemnify BP**

On May 19, 2006, BP sent a letter to ExxonMobil asking ExxonMobil, pursuant to the 1993 Agreement, to defend and indemnify BP against the Greenpoint Contamination Litigation. (*See* BP's May 19, 2006 Letter, Dkts. 36-8, 37-14, at 1–3.)  In a letter dated February 7, 2007, ExxonMobil responded that the 2004 Agreement "modified" its "indemnity obligation relating to Greenpoint in certain respects," and, more specifically, that BP "expressly released" ExxonMobil from any and all claims relating to "responsibility for remediating contamination at the Greenpoint Area." (*See* ExxonMobil's Feb. 7, 2007 Letter, Dkts. 36-9, 37-15, at 1.)[6]  Referring to the Greenpoint Contamination Litigation as "toxic tort lawsuits," ExxonMobil stated that it was "willing to assume BP's defense and indemnify BP, subject to [certain] terms and conditions." (*Id.* at 2.)  By letter dated March 7, 2007, BP refused to accept ExxonMobil's proposal due to the terms and conditions demanded by ExxonMobil.  (*See* BP's Mar. 7, 2007 Letter, Dkt. 36-10, at 4.)

In light of their disagreement regarding whether ExxonMobil had to defend and indemnify BP against the Greenpoint Contamination Litigation, the parties agreed to toll their claims "for failure to maintain hydraulic control pursuant to the 2004 Agreement and for reimbursement of defense costs, respectively."  (Def. 56.1, Dkt. 36-1, ¶ 15.)  In 2011 and 2013, ExxonMobil "negotiated a settlement of all claims in the Spiroff and Baumbach Actions, respectively" and "[i]n each settlement, ExxonMobil secured a full release and discharge of all claims against both ExxonMobil and BP in exchange for material payments made solely by ExxonMobil."  (*Id.* at 16.)

---

[6] ExxonMobil asserted that the claims advanced in two actions that do not fall under the Greenpoint Contamination Litigation discussed herein—*Riverkeeper, Inc. et al. v. ExxonMobil Mobil Corp.* and *Markowitz et al. v. ExxonMobil Corp.*—in which ExxonMobil sought to implead BP, were "covered by the release in the 2004 Agreement" because they sought injunctive relief "requiring additional remediation relating to the Greenpoint [C]ontamination" and ExxonMobil therefore "owe[d] no obligation to indemnify BP" in those actions.  (ExxonMobil's Feb. 7, 2007 Letter, Dkts. 36-9, 37-14, at 2; Pl. 56-1, Dkt. 37-2, ¶ 37; Def. 56.1 Opp., Dkt. 36-16, ¶ 37.)

## III.     The Present Action

On June 3, 2019, BP filed a complaint against ExxonMobil alleging that ExxonMobil breached the 1993 Agreement and seeking (1) payment of costs and expenses it accrued in defending the Greenpoint Contamination Litigation and (2) a declaration that ExxonMobil has a duty to reimburse BP.  (*See* Complaint, Dkt. 1, ¶¶ 27–34, 43–53.)  The parties filed their cross-motions for summary judgment on April 9, 2021.  (*See* Dkts. 36, 37, 38, 39.)[7]

### STANDARD OF REVIEW

Summary judgment is appropriate only where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);  *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).  "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'"  *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact . . . ."  *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019).  Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial.  *See Spinelli v. City of*

---

[7] BP's request for oral argument (Dkt. 21) is denied as unnecessary.

*New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013) (quoting *Anderson*, 477 U.S. at 252).  That is, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*."  *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . ."  *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021).  It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine" dispute as to those facts.'"  *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "[T]he district court may not properly consider the record in piecemeal fashion; rather, it must 'review all of the evidence in the record.'"  *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

"The same standard of review applies when the court is faced with [a] cross-motion[] for summary judgment."  *Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (internal quotation marks omitted).  When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration.  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

**DISCUSSION**

I.    **ExxonMobil's Duty to Defend BP Pursuant to Parties' Agreements**

    A.    **The "Defend and Indemnify" Clause in the 1993 Agreement**

Under Illinois law, which governs the 1993 Agreement,[8] an agreement to defend and indemnify "is a contract and is subject to contract interpretation rules." *Buenz v. Frontline Transp. Co.*, 882 N.E.2d 525, 528 (Ill. 2008). Illinois courts look to the language of the contract to determine the parties' intent in executing it. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) ("[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." (quoting *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285 (Ill. 1962))). "Where the contract language is unambiguous, it should be given its plain and ordinary meaning." *Buenz*, 882 N.E.2d at 529.

"Indemnity contracts are to be strictly construed, and any ambiguity in the agreement is to be construed most strongly against the indemnitee . . . ." *Kmart Corp. v. Footstar, Inc.*, 777 F.3d 923, 928 (7th Cir. 2015) (brackets omitted) (quoting *Blackshare v. Banfield*, 857 N.E.2d 743, 746 (Ill. 2006)). Thus, "an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract . . . or such intention is expressed in unequivocal terms." *Buenz*, 882 N.E.2d at 529. "Illinois courts construe contractual clauses seeking partial indemnity as clauses seeking

---

[8] The parties generally agree that Illinois law governs the 1993 agreement, but dispute whether Illinois law or federal law governs the Court's consideration of the reasonableness of fees and costs sought by BP pursuant to the 1993 Agreement. As discussed below, *see supra* n.16, the Court does not need to reach that issue here.

contribution." *FHP Tectonics Corp. v. NES Rentals Holdings, Inc.*, No. 1-14-1650 (EOB), 2016 WL 3387306, at *12 (Ill. App. Ct. Jun. 17, 2016).[9]  "Contribution differs from indemnity in that indemnity shifts an entire loss from one tortfeasor to another, whereas contribution distributes a loss among tortfeasors by requiring each to pay his proportionate share." *Id.*

The "phrase 'any and all' alone [does] not determine whether a contra[]ct provides indemnification for an indemnitee's own negligence, but rather the phrase must be considered in the context of the entire contract." *Gen. Cas. Co. of Ill. v. Prof'l Mfrs. Reps., Inc.*, Nos. 2-10-385, 2-10-386, 2-10-387 (JJB), 2011 WL 10109741, at *8 (Ill. App. Ct. May 25, 2011) (citing *Buenz*, 882 N.E.2d at 529).  Illinois courts thus look to the entire contract to determine if it contains "any limiting language suggesting that the indemnity provision was not meant to cover claims resulting from" the indemnitee's own negligence. *Id.* at *9.  "[T]he focus on liability from the indemnitee's conduct is what often distinguishes cases in which the indemnitor was found liable for only its own negligence from cases where the indemnitor was also found liable for the indemnitee's negligence." *Id.* at *11.  "If the contract warrants it[,] . . . the use of the phrase 'any and all' may indicate . . . that the parties intended an indemnitee be indemnified, even for the indemnitee's own negligence." *Buenz*, 882 N.E.2d at 533.

Here, the 1993 Agreement provides that:

> Mobil and its Affiliates hereby agree to defend, indemnify, and hold harmless Amoco and its Affiliates from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including attorney's fees), asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint

---

[9] While Illinois Supreme Court Rule 23(e) provides "that *parties* may *not* cite to nonprecedential orders except for limited purposes," "nothing in the language of [the rule] prevents a court from doing so." *Crystal Lake Ltd. P'ship v. Baird & Warner Residential Sales, Inc.*, 138 N.E.3d 75, 92 (Ill. App. Ct. 2018) (citing *In re Estate of LaPlume*, 24 N.E.3d 792, 798 (Ill. App. Ct. 2014) and *People ex rel. Webb v. Wortham*, 127 N.E.3d 106, 111 (Ill. App. Ct. 2018)).

> Contamination or any dissolved substances associated with the liquid plume which are not physically located under Amoco's Brooklyn terminal property.

(1993 Agreement, Dkt. 36-4, § IV(C)).  Because the 1993 Agreement is unambiguous, the Court interprets it according to "its plain and ordinary meaning." *Buenz*, 882 N.E.2d at 529.

The 1993 Agreement is broad and requires ExxonMobil to defend BP against "any and all claims" "arising out of or otherwise relating to" the Greenpoint Contamination.  The use of the term "any and all" in the indemnification clause is not accompanied by any limiting language that would "suggest that the indemnity provided is not intended to cover claims resulting from [BP's] own negligence." *Id.* at 534.  This means that the agreement allocates responsibility between the parties for the Greenpoint Contamination regardless of their relative culpability: ExxonMobil promised to defend and indemnify BP for any and all culpability "relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume" not located under the BP Terminal, and this duty is not cabined by any limiting language that would require BP to defend itself for its own negligence in connection with the Greenpoint Contamination.  ExxonMobil received $1 million from BP in exchange for this promise.

ExxonMobil argues that the 1993 Agreement provides for a partial indemnity because the language of the agreement (1) does not expressly provide for indemnification for BP's own negligence and (2) states that ExxonMobil will not defend BP for or against claims related to contamination physically located under the BP Terminal.  (Defendant's Summary Judgment Brief ("Def. Br."), Dkt. 36-2, at 15.)  Neither argument is persuasive.

First, the court's analysis of the indemnity clause "depends upon the particular language used [by the parties] and the factual setting of the case." *Buenz*, 882 N.E.2d at 530.  In cases where Illinois courts construed the indemnity to be limited, the contractual language specifically provided

that the indemnitor's duty to defend only extends to claims arising out of indemnitor's *own conduct*. *See, e.g.*, *Gen. Cas. Co. of Ill.*, 2011 WL 10109741, at *11 (no indemnity for indemnitee's own negligence because the contract provided that the indemnitor would defend and indemnify indemnitee against claims arising from the indemnitor's conduct); *Blackshare v. Banfield*, 857 N.E. 2d 743, 745–46 (Ill. App. Ct. 2006) (same); *Hankins v. Pekin Ins. Co.*, 713 N.E. 2d 1244, 1248–49 (Ill. App. Ct. 1999) (same); *McNiff v. Millard Maint. Serv. Co.*, 715 N.E. 2d 247, 249–50 (Ill. App. Ct. 1999) (same); *see also BNSF Ry. Co. v. Probuild North LLC*, No. 1-12-3648 (PSN), 2014 WL 2619015, at *4 (Ill. App. Ct. Jun. 11, 2014) ("The indemnity clause . . . specifically provides . . . that '[i]f any claim or liability shall arise from the joint or concurring negligence of the parties hereto, it shall be borne by them equally.' Thus, the [agreement at issue] requires ProBuild to indemnify BNSF for losses other than the losses caused by the negligence of BNSF and BNSF's employees").[10]  No such limiting language is present here.

Second, the language in the indemnity provision that carves out the physical location under the BP Terminal does not limit the scope of the parties' agreement; it simply and plainly identifies a geographical area for which ExxonMobil bears no responsibility.  This does not indicate that the parties intended to limit allocation of liability according to their respective culpability, or distribute "loss among [BP and ExxonMobil] by requiring each to pay [its] proportionate share."[11]  *FHP*

---

[10] In addition to considering the contractual language, Illinois courts look to state statutes that limit indemnification for public policy reasons.  For example, Illinois statutes prohibit indemnitees in construction and healthcare industries from being indemnified for their own negligence.  *See Buenz*, 882 N.E.2d at 534–35.  No such statutes are applicable to the Court's analysis here.

[11] Although the Court does not consider evidence extrinsic to the four corners of the 1993 Agreement in reaching this conclusion, it is worth noting that Amoco bought the BP Terminal from ExxonMobil's predecessor, Mobil, which had owned and operated a petroleum refinery facility located on the property until 1965, and was later identified in the G&M Report as the likely cause of the oil spill detected by the Coast Guard in 1978.

*Tectonics Corp.*, 2016 WL 3387306, at *12.  Rather, it is clear that the parties intended to allocate responsibility to ExxonMobil regardless of culpability.  This is further supported by the Court's consideration of the relevant indemnity language in the context of the entire contract.  *Gen. Cas. Co. of Ill.*, 2011 WL 10109741, at *8.  The introductory recitals clearly state that the parties entered into the 1993 Agreement "in order to *fully resolve* all existing disagreement *over responsibility* and *allocate liability* for environmental contamination (including, among other things, third party personal injury and property damages claims) between Amoco and Mobil in connection with . . . the Greenpoint Contamination."  (1993 Agreement, Dkt. 36-4, at 2 (emphasis added).)  Because a "contract must be construed as a whole, viewing each part of the contract in light of the others," *Hussar v. Brewster Condo. Corp.*, No. 1-17-2524 (TEH), 2018 WL 3130844, at *5 (Ill. App. Ct. Jun. 22, 2018), the Court "conclude[s] that the express language of the parties' agreement clearly and explicitly provides indemnification for [BP's] own negligence; that is, taken in their common and unambiguous meaning, the words used in the indemnification provision encompass even claims that arise out of [BP's own] negligence [relating to the Greenpoint Contamination]," *Nicor Gas Co. v. Vill. of Wilmette*, 884 N.E.2d 816, 822 (Ill. App. Ct. 2008).

Thus, under the 1993 Agreement, ExxonMobil is obligated to defend and indemnify BP for any and all culpability "relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume" not located under the BP Terminal," including contamination resulting from BP's own negligence.

### B.    The Release Clause in the 2004 Agreement

Under New York law, which governs the 2004 Agreement,[12] "[a] release is a contract, and

its construction is governed by contract law."  *Schiller v. Guthrie*, 958 N.Y.S.2d 736, 737 (App.

Div. 2013).  Therefore, "[w]here a release is unambiguous," the court must ascertain the intent of

the parties "from the plain language of the agreement."  *Id.*  Courts "should be extremely reluctant

to interpret an agreement as impliedly stating something which the parties have neglected to

specifically include," *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d

995, 1001 (N.Y. 2011), or "'impos[e the court's] own conception of what the parties should or

might have undertaken, rather than confining itself to the implementation of a bargain to which'

the parties have committed themselves," *CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 874

N.Y.S.2d 174, 177 (App. Div. 2009) (quoting *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*,

52 N.Y.2d 105, 109 (1981)).

Generally, "a valid release constitutes a complete bar to an action on a claim which is the

subject of the release."  *Centro Empresarial*, 952 N.E.2d at 1000.  Where "there is no evidence

that the agreement was not fairly and knowingly made or that the parties intended it to cover a

narrower range of claims than its plain language suggests," the court should apply "the plain

language of the release."  *Rivera v. Wyckoff Heights Med. Ctr.*, 978 N.Y.S.2d 337, 341 (App. Div.

2014).  Where a release is executed "in a commercial context by parties in a roughly equivalent

bargaining position and with ready access to counsel, the general rule is that, if 'the language of

the release is clear, the intent of the parties is indicated by the language employed.'" *Locafrance*

*U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977) (brackets and

ellipsis omitted) (quoting *German Roman Catholic Orphan Home v. Liberty Nat'l Bank & Trust*

---

[12] The parties do not dispute that the 2004 Agreement is governed by New York law.

*Co. (In re Schaefer)*, 274 N.Y.S.2d 869, 872 (1972)).  However, "[t]he meaning and coverage of a general release depends on the controversy being settled and upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of."  *Huma v. Patel*, 890 N.Y.S.2d 639, 640 (App. Div. 2009) (internal quotation marks and citation omitted).

The parties do not contend that the 2004 Release is ambiguous.  Therefore, the Court ascertains the parties' intent "from the plain language of the agreement."  *Schiller*, 958 N.Y.S.2d at 737.  Under the 2004 Agreement, BP "remise[d], release[d], and forever discharge[d]" ExxonMobil "of and from any and all . . . agreements . . . relating to . . . responsibility for remediating contamination at the Greenpoint Area."  (2004 Agreement, Dkt. 36-5, § 6(b).)  The parties dispute whether this language released ExxonMobil from defending BP against any and all claims relating to remediation of the Greenpoint Contamination, if claimants seek damages as opposed to, or in conjunction with, injunctive relief. [13]

ExxonMobil asserts that "the 2004 Agreement's release provision applies to 'any and all claims or demands whatsoever' relating to responsibility for remediating contamination in Greenpoint—and that, by its very terms, [this] includes claims or demands predicated upon a

---

[13] The parties appear to agree that the 2004 Agreement released ExxonMobil's obligation to indemnify and defend BP against suits that seek *remediation* of the Greenpoint Contamination, *i.e.*, injunctive relief.  (*See* Plaintiff's Summary Judgment Brief ("Pl. Br."), Dkt. 37-1, at 3 ("[T]he plain language of the parties' separate 2004 Agreement did not release ExxonMobil's obligation to defend BP from the civil lawsuits seeking *compensatory damages*." (emphasis added)); Plaintiff's Opposition Summary Judgment Brief ("Pl. Opp. Br."), Dkt. 38, at 1–2 ("Such third party claims seeking money damages are not within the scope of the 2004 Agreement which provided a limited release for claims related to "responsibility for remediating contamination at the Greenpoint Area."); Defendant's Summary Judgment Brief ("Def. Br."), Dkt. 36-2, at 2 ("[B]ecause the plaintiffs in the underlying lawsuits sought remediation as a remedy for their claims, BP cannot seek reimbursement of the fees it incurred in defending against those claims because they released them as part of the 2004 agreement.").)

request (even a single one) for an order compelling ExxonMobil and BP to remediate the plume."
(Defendant's Summary Judgment Reply ("Def. Reply"), Dkt. 36-17, at 4.)  ExxonMobil's reading
of the 2004 Release is too broad.

While the plain language of the 2004 Release is broad in certain respects, it is
unambiguously limited to claims and causes of action "relating to" "responsibility for *remediating
contamination* at the Greenpoint Area."  (2004 Agreement, Dkt. 36-5, § 6(b) (emphasis added).)
Moreover, the 2004 Agreement provides that, "[e]xcept where amended by this Agreement, the
1993 Agreement shall remain in full force and effect."  (*Id.*, § 8; Def. 56.1, Dkt. 36-1, ¶ 7.)  The
parties' decision to expressly limit the 2004 release to "remediation" of the Greenpoint
Contamination belies any inference that the parties intended to include third-party claims and
causes of action for damages in that release, and thus ExxonMobil's 1993 agreement to defend BP
as to all claims relating to the Greenpoint Contamination remained intact after the 2004
Agreement, except as to remediation claims.  *See Zilinskas v. Westinghouse Elec. Corp.*, 669
N.Y.S.2d 703, 705 (App. Div. 1998) ("Here, the general language of the instrument releasing Oak
Mitsui 'from all claims of any kind or nature' was followed by a specific recital limiting the claims
released to those 'relating to the installation of a busway at [Oak Mitsui's] facility. By restricting
the general words of release to specific claims relating to the busway installation, the parties
expressed their clear intent that the release was to be operative only with respect to claims
regarding the busway."); *see also Carew v. Baker*, 109 N.Y.S.3d 205, 207 (App. Div. 2019) (the
release contained in a settlement agreement entered into by the plaintiff to discontinue a
disciplinary proceeding "alleging that he stole a coworker's tool and provided false information to
investigators" "clearly and unambiguously encompass[ed]" an "action to recover damages for

defamation" where the plaintiff alleged that he was "falsely accus[ed]" "of stealing the coworker's tool" and "that these accusations led to the disciplinary charges.").

The "controversy being settled" by the 2004 Agreement and "the purpose for which the release was actually given" both support the conclusion that the 2004 Release "may not be read to cover matters which the parties did not desire or intend to dispose of," *Huma*, 890 N.Y.S.2d at 640, namely, third-party suits for damages. The parties entered into the 2004 Agreement to resolve the 1999 Action, in which BP/Amoco alleged that ExxonMobil had breached the 1993 Agreement and as a result "sub-surface petroleum products attributable to the Mobil plume were continuing to migrate through the sub-surface under the Amoco terminal." (Pl. 56.1, Dkt. 37-2, ¶¶ 19, 21; Def. 56.1 Opp., Dkt. 36-16, ¶¶ 19, 21.) "ExxonMobil asserted a counterclaim, which alleged, among other things, that BP had breached the 1993 Agreement by failing to prevent subsurface petroleum products from migrating onto properties being remediated by ExxonMobil." (Def. 56.1, Dkt. 36-1, ¶ 4; Pl. 56.1 Opp., Dkt. 38-1, ¶ 4.) Thus, the parties asserted failure to remediate claims against each other and entered into the 2004 Agreement to resolve the 1999 Action, each agreeing to "maintain hydraulic control" on the southern and western boundaries of the BP Terminal, respectively, "to prevent petroleum products 'from migrating in the future'" to and from the BP Terminal. (Def. 56.1, Dkt. 36-1, ¶¶ 21–22; Pl. 56.1 Opp., Dkt. 38-1, ¶¶ 21–22.) The parties' focus on remediation in the 2004 Agreement is apparent. The 2004 Agreement clearly had nothing to do with third-party claims for damages, and the release provisions in that agreement cannot be read to encompass such claims.

Thus, because the 2004 Agreement provided that "the 1993 Agreement remain[ed] in full force and effect" otherwise (2004 Agreement, Dkt. 36-5, § 8; Def. 56.1, Dkt. 36-1, ¶ 7),

ExxonMobil still owed a duty to defend BP against any and all claims for damages related to the Greenpoint Contamination after the 2004 Agreement.

### C.     The Complaints in the *Baumbach* and *Spiroff* Actions

To determine an indemnitor's duty to defend an indemnitee against a particular legal action, "[c]ourts look first to the allegations of the underlying complaints."  *Kmart Corp. v. Footstar, Inc.*, No. 09-CV-3607, 2012 WL 1080262, at *13 (N.D. Ill. Mar. 30, 2012) (citing *Am. Econ. Ins. Co. v. DePaul Univ.*, 890 N.E.2d 582, 588 (Ill. App. 2008)), *aff'd in part*, *rev'd in part*, 777 F.3d 923 (7th Cir. 2015).[14]  Unlike an insurer, which is obligated to defend the indemnitee "even if the allegations are groundless, false, or fraudulent," "an indemnitor may independently investigate [the underlying complaint] to determine whether the facts fall within the relevant indemnity provision."  *Id.; see also Ervin v. Sears, Roebuck and Co.*, 469 N.E.2d 243, 249 (App. Ct. 1984).  "If, despite the allegations" in the underlying complaint, "the facts clearly show[] that there" are no claims covered by the indemnity contract, the indemnitor has no duty to defend the indemnitee.  *Sears, Roebuck and Co. v. Savoy Reinsurance Co., Ltd.*, No. 90-CV-1202 (WTH), 1991 WL 22501, at *4 (N.D. Ill. Feb. 15, 1991).  "But an indemnitor must have a good faith factual basis for denying coverage."  *Kmart Corp.*, 2012 WL 1080262, at *13.  Thus, "a party to a contractual indemnity requirement may not refuse to defend when confronted with allegations in a complaint that could give rise to liability under the indemnity provision, without actually exercising its right to look behind the bare allegations."  *Litterer v. United States*, 545 F. Supp. 3d 625, 638 (N.D. Ill. 2021) (internal quotation marks, ellipsis, and brackets omitted).

---

[14]  Because ExxonMobil's duty to defend and indemnify BP arises under the 1993 Agreement, the Court again turns to Illinois law, which governs the 1993 Agreement with a caveat previously stated *infra* n.8.

The complaints in the Greenpoint Contamination Litigation alleged that the plaintiffs "suffer[ed] ongoing injury and damages to their persons and properties" due to the Greenpoint Contamination caused by BP, ExxonMobil, and other defendants.   (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 1–2; Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶¶ 1–2.)  Relying on the 1979 G&M Report, the plaintiffs alleged that the historic oil spill resulted in millions of gallons of Plume and that BP and others took "little action, if any, . . . to eliminate, correct, and or remedy the [Plume] or prevent its continued migration."  (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 411–13, 416; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 41–43, 46.)  The plaintiffs thus alleged that the defendants had failed to remediate the historic oil spill and that the ongoing migration of Plume resulted in permanent and continuing harm to the plaintiffs.  (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 417–22; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 48–58.)

BP and ExxonMobil dispute whether the claims in the Greenpoint Contamination Litigation are covered by the 1993 Agreement's indemnity provision, given the carve-out created by the release in the 2004 Agreement for remediation claims.  (2004 Agreement, Dkt. 36-5, ¶ 6(b) (BP "remises, releases, and forever discharges" ExxonMobil "of and from any and all . . . agreements . . . relating to . . . responsibility for remediating contamination at the Greenpoint Area.").  BP argues that because the *Baumbach* and *Spiroff* plaintiffs sought only damages, and not injunctive relief, the release in the 2004 Agreement does not apply, and ExxonMobil is bound by the 1993 Agreement to defend and indemnify BP in the Greenpoint Contamination Litigation.  But BP's assertion that the Greenpoint Contamination Litigation did not seek injunctive relief is plainly incorrect.  The complaints in the Greenpoint Contamination Litigation requested, in addition to costs for medical and property injuries, injunctive relief, "including, but not limited to, an order compelling [defendants] to take specific actions to cleanup, remediate, and/or correct the

[Plume]." (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 437–39; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶¶ 77–79.)  In an attempt to avoid this incontrovertible fact, BP argues that plaintiffs did not actually seek injunctive relief because their requests for injunctive relief were in "a single paragraph contained in the general allegations" of the complaints and "appear[] nowhere in any of the . . . specific legal claims or in any of the *ad damnum* clauses."[15]  BP does not cite to any legal authority to support its position that a request for injunctive relief, incorporated by reference into each cause of action, is not a request for injunctive relief.  There is no need to look beyond the facial allegations in the *Baumbach* and *Spiroff* complaints to determine that those actions plainly sought injunctive relief in the form of remediation, for which BP released any and all claims against ExxonMobil in the 2004 Agreement.[16]  Because BP released ExxonMobil from all agreements relating to claims for remediation of the Greenpoint contamination, *i.e.*, injunctive relief, BP, not ExxonMobil, had to defend BP in the *Baumbach* and *Spiroff* actions against such claims.

However, that does not mean that ExxonMobil's duty to defend BP was not triggered with respect to the other claims brought in the Greenpoint Contamination Litigation.  The *Baumbach* and *Spiroff* plaintiffs sought in excess of $1 billion for damages "arising out of or otherwise relating

---

[15] BP attempts to differentiate between the *Baumbach* and *Spiroff* complaints, but both contain an identical request for injunctive relief.  (Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶ 439; Spiroff Fifth Am. Cmpl., Dkt. 36-7, ¶ 79.)  Moreover, BP's argument that Magistrate Judge Robert Levy's August 2006 Report and Recommendation in a prior case, adopted by District Judge Carol Amon, finding that the *Baumbach* plaintiffs sought strictly monetary damages, is not persuasive. First, that decision was issued before the *Baumbach* complaint was amended and, as already discussed, the Court relies on the operative complaints in the underlying actions in its analysis, *see supra* n.5.  Second, the decision addressed ExxonMobil's motion to join BP and another party in the *Markowitz* action, *see supra* n.6, and is not related the issues raised here.

[16] That the *Baumbach* and *Spiroff* Actions settled for damages only does not mean that the plaintiffs did not seek injunctive relief in their complaints.  Settlements are compromises and it is common for parties to accept an outcome different or less than that sought in the complaint.

to environmental contamination associated with a[] portion of the Greenpoint Contamination [and] dissolved substances associated with the liquid plume which are not physically located under" the BP Terminal.  (1993 Agreement, Dkt. 36-4, § IV(C)).  The Court therefore concludes that ExxonMobil, "confronted with allegations in a complaint that could give rise to liability under the indemnity provision," did not have a good faith basis to refuse to defend BP against these claims. *Litterer*, 545 F. Supp. at 638 (brackets omitted).  ExxonMobil concedes as much but argues that "[a]t least *some* of the *Baumbach* and Napoli plaintiffs' allegations and claims fall outside the scope of the 1993 Agreement's indemnification provision" because "the *Baumbach* and Napoli plaintiffs alleged, among other things, that they were injured by oil and oil products that were either underneath or migrated off of the BP Terminal."  (Defendant's Opposition Summary Judgment Brief ("Def. Opp. Br."), Dkt. 36-15, at 3–4, 6 (emphasis added, original emphasis removed)); *see also id.* at 1 (arguing that ExxonMobil was not obligated to defend BP against "claims supported by *such* allegations" and that "BP was obligated to defend itself against *such* claims" (emphasis added).)

ExxonMobil is correct that the complaints in the Greenpoint Contamination Litigation included allegations that the plaintiffs were injured by oil and oil products that were either underneath or had migrated off of the BP Terminal.  For example, the complaints alleged, among other things, that: (1) "Due to the . . . actions of the various defendants [including BP], millions of gallons of oil and oil products have been released into the ground and Defendants have continued to this date to fail to remove the contamination which migrated and continues to migrate onto plaintiffs' properties causing plaintiffs to suffer ongoing injury . . . .";  (2) "Defendant[] BP . . . so negligently stored, transported, and/or disposed of . . . oil and oil products[] so as to cause severe contamination of the ground, soil, groundwater, and/or aquifer, and/or said defendant[] own[s] or

owned property upon which such actions and/or results occurred"; and (3) "Defendant[] BP . . . [is and was a person] who discharged, participated in actions constituting discharge, and/or [was] otherwise [a] discharger[] of petroleum. . . . Defendant[] discharged petroleum and/or petroleum was discharged into properties owned, leased, occupied, and/or otherwise controlled by defendant[]. . . . As a result of defendant[']s[] discharge of petroleum onto and into state lands, waters, and plaintiffs' properties, plaintiffs and their properties have been injured . . . .". (Def. Br., Dkt. 36-2, at 5–8 (brackets in original) (quoting Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶¶ 2, 409, 434, 485–86, 489; Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶¶ 2, 39, 74, 146–47, 150).)

BP asserts that the complaints relied on historical contamination of Greenpoint, as determined by G&M in 1978, and that the harm stems from contamination that has not been remediated.  What BP misses, however, is that the complaints allege an ongoing migration of Plume physically located under the BP Terminal onto the plaintiffs' properties.  (*See, e.g.*, Baumbach Fifth Am. Cmpl., Dkt. 36-6, ¶ 420; Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶ 56 ("The actions chosen and taken by [defendants] were with knowledge that such delay and minimal action would cause the [oil and oil products] to disburse and migrate off of the [terminals] [including the BP Terminal] . . . and onto plaintiffs' land and property"); Baumbach Fifth Am. Compl., Dkt. 36-6, ¶ 423 and Spiroff Fifth Am. Cmpl., Dkt. 35-7, ¶ 59 ("As [oil and oil products] migrate from [defendants'] property . . . [and] result in new . . . hazardous materials . . . interfering with the rights of plaintiffs as a result of [defendants'] actions.").)  Such allegations fall squarely outside of the parties' allocation of liability for the Greenpoint Contamination to ExxonMobil after the 2004 Agreement.

BP argues that, even if the Greenpoint Contamination Litigation complaints asserted certain claims against which ExxonMobil was not required to defend BP, the complaints can be

characterized as "mixed allegation" under Illinois law, which requires ExxonMobil to defend BP against *all* claims.  But the concept of "mixed allegation" complaints is borrowed from insurance law, and "Illinois courts recognize that there is a fundamental difference between insurers and non-insurers." *Wilda v. JLG Indus., Inc.*, 470 F. Supp. 3d 770, 787 (N.D. Ill. 2020) (internal quotation marks omitted).  Non-insurers "simply do not have the same specialized experience of providing insurance as an actual insurance company," and "[t]he reason for imposing a heightened duty to defend on insurers—because they are professional sellers of insurance—is therefore not present in the non-insurance context." *Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, No. 1-15-369 (LCL), 2015 WL 6735491, at *7 (Ill. App. Ct. Nov. 2, 2015).  The distinction between insurers and non-insurers is especially significant here, where the parties' agreements contain certain carve-outs—one for claims arising out of Plumes located under the BP Terminal and one for claims seeking injunctive relief in the form of remediation.  While these carve-outs do not apportion liability based on relative culpability, they do demonstrate a clear intent between two sophisticated parties to clearly define the scope of ExxonMobil's duty to defend BP in litigation related to lawsuits such as the Greenpoint Contamination Litigation.  *Cf. Litterer*, 545 F. Supp. 3d at 641–42 ("The obvious intent of indemnity provision was for the City to avoid having to incur costs in suits arising out of or related to [United Maintenance Services, Inc.'s ('UMS')] work[.] . . . Litterer's 2018 complaint contained allegations that triggered UMS's obligation . . .").

BP relies on two cases to support its position, but neither helps its cause.  First, in *Sears, Roebuck v. Insurance Company of North America*, the court held that a non-insurer indemnitor had a duty to defend an indemnitee pursuant to a purchase agreement because "[i]n the event of a so-called mixed allegation complaint, where there is doubt as to whether a theory of recovery within the policy coverage has been pleaded in the underlying complaint, the insurer *must* defend."

24

No. 89 C 5795 (GWL), 1990 WL 115570, at *3–4 (N.D. Ill. Aug. 9, 1990) (internal quotation marks omitted).  In so holding, the court explicitly relied on insurance law.  As already discussed, Illinois courts draw a distinction between insurers and non-insurers, and well-established insurance law doctrines do not neatly map onto non-insurance cases.  Second, BP relies on *Kmart Corporation*, where the court held that a non-insurer indemnitor's duty to defend was triggered where the underlying personal injury complaint and its supporting facts did "not show that [the indemnitor] 'indisputably' had no causal connection to [the plaintiff's] injury."  2012 WL 1080262, at *15.  The underlying complaint there alleged, and an investigation of the facts revealed, that the indemnitor's employee may have been responsible for the indemnitee's customer's injuries.  The court thus held that "[e]ven if liability was ultimately based only on [the indemnitee's] actions, . . . [the indemnitor] would still have a duty to defend to the extent that there exist claims that [the indemnitor] potentially caused the accident."  *Id.*  Significantly, the court found that the indemnitor would have to defend the indemnitee *to the extent* the suit's claims fell within the parties' agreement.  *Id.*  That is exactly the result the Court reaches here.  ExxonMobil did not and could not breach the 1993 Agreement by refusing to defend BP against claims that were beyond the scope of ExxonMobil's contractual duty.  *See 933 Van Buren Condo. Ass'n v. West Van Buren, LLC*, 61 N.E.3d 929, 942 (Ill. App. Ct. 2016) ("Total did not breach the indemnification agreement with WVB when it refused to defend WVB against the HOA's fraud claims as those claims fell outside the scope of the indemnification provision."); *cf. id.* at 943–44 ("We find that [warranty of habitability] allegations, which arise out of faulty work on the roof, fall within the scope of both indemnification clauses, thus triggering IRCA's and Total's duties to defend *with respect to these claims*." (emphasis added)).

BP also argues that the case relied on by ExxonMobil, *Dominick's Finer Foods, LLC*, 2015 WL 6735491, at *36, "simply found that a private indemnitor had no obligation to defend a Complaint when 'there were no allegations in the Complaint that any act or omission of [indemnitor's] employee caused any of [plaintiff's] injuries'"—which is not the situation here. (Pl. Reply, Dkt. 39, at 3–4 (brackets in original).)  A full reading of that case further demonstrates the distinct treatment of insurers and non-insurers under Illinois law.  In *Dominick's*, the court found that the non-insurer indemnitor did not have a duty to defend because "the claims brought against [the indemnitor] were alternative to the claims asserted against [the indemnitee]."  2015 WL 6735491, at *8.  However, the court also found that had the indemnitor procured insurance naming indemnitee as an additional insured, as required by the parties' contract, the insurer—unlike the non-insurer indemnitor—would have owed a duty to defend the indemnitee.  *Id.* at *10 ("It is not surprising that defendant, a floor cleaning company, chose to reject plaintiff's tender. We would not expect the same result from an insurance company.  Presumably, the insurance company would have recognized that the [plaintiff-indemnitees'] second amended complaint potentially exposed plaintiff to liability for a negligent act of defendant, thereby requiring it to provide plaintiff with a defense.").

Thus, the Court finds that, by operation of the 1993 and 2004 Agreements, ExxonMobil had a duty to defend and indemnify BP with respect to the damages claims in the Greenpoint Contamination Litigation, but not with respect to the remediation (injunctive relief) claims.

**D.     Waiver of Claims and Defenses**

BP asserts that ExxonMobil waived its right to assert defenses in this action.  Because BP's claims are premised on the 1993 Agreement, Illinois law applies.[17]

Under Illinois law, "[w]aiver is an express or implied relinquishment of a known right." *Acuity v. Southwest Spring, Inc.*, No. 1-14-2380 (FS), 2016 WL 363109, at *8 (Ill. App. Ct. Jan. 20, 2016); *Essex Ins. Co. v. Stage 2, Inc.*, 14 F.3d 1178, 1181 (7th Cir. 1994); *see also Lumbermen's Mut. Cas. Co. v. Sykes*, 890 N.E.2d 1086, 1097 (Ill. App. Ct. 2008) ("[W]aiver is an equitable principle invoked to further the interests of justice whenever a party initially relinquishes a known right or acts in such manner as to warrant an inference of such relinquishment." (internal quotation marks omitted)).  "An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it." *Liberty Mut. Ins. Co. v. Westfield Ins. Co.*, 703 N.E.2d 439, 441 (Ill. App. Ct. 1998).  "Waiver, like estoppel, depends on the facts of the case."  *Frain Camins & Swartchild, Inc. v. Bank of Am. Nat. Tr. And Sav. Ass'n*, No. 91 C 8165 (JBZ), 1994 WL 174149, at *6 (N.D. Ill. May 4, 1994). The party asserting waiver bears the burden of proof "by clear, precise and unequivocal evidence." *Id.* at *5.  "Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law as to whether the facts proved constitute waiver." *Liberty Mut. Ins. Co.*, 703 N.E.2d at 441.  "However, if the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to inferences to be drawn from undisputed evidence, then the issue becomes a question of fact." *Wald v. Chicago Shippers Ass'n*, 529 N.E.2d 1138, 1148 (Ill. App. Ct. 1988).

---

[17] As already discussed, the parties generally agree that Illinois law governs the 1993 agreement, *see supra* n.8.

BP relies on insurance law in arguing that ExxonMobil waived its right to assert defenses in this action.  BP's reliance on insurance law is once again misplaced.  "An insurer that denies its own liability under [an insurance] policy has three alternatives: (1) seek a declaratory judgment regarding its obligations before or pending trial of the underlying action; (2) defend the insured under a reservation of rights; or (3) refuse either to defend or to seek a declaratory judgment." *Eclipse Mfg. Co. v. U.S. Compliance Co.*, 886 N.E.2d 349, 356 (Ill. App. Ct. 2007) (internal quotation marks and brackets omitted).  "An insurer chooses the last option at its own peril, because, if it is later found to have wrongfully denied a defense to its insured, it will have breached its insurance contract" and is estopped from "asserting any defense based on noncoverage." *Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*, 848 N.E.2d 597, 604 (Ill. App. Ct. 2006).  This principle "is deeply rooted in Illinois jurisprudence" and "arose out of the recognition that an insurer's duty to defend under a liability insurance policy is so fundamental an obligation that a breach of that duty constitutes a repudiation of the contract." *Eclipse Mfg. Co.*, 886 N.E.2d at 356.  As already discussed, Illinois courts distinguish between insurers and non-insurer indemnitors.  "[I]n contrast [to insurance policies], the agreement to defend and indemnify in a [non-insurance] contract . . . is incidental to the main purpose of the agreement . . . ." *Ervin*, 469 N.E.2d at 249.  "Given the unique position of an insurance company as a professional 'seller' of protection against loss, and the fundamentally different role of" a non-insurer, *id.* at 249–50, the insurance law principles of waiver are inapplicable here.

Moreover, BP's waiver argument under insurance law would fail even if it applied.  BP tendered its defense to ExxonMobil on May 19, 2006.  (BP's May 19, 2006 Letter, Dkts. 36-8, 37-13, at 1–2.)  In a letter dated February 7, 2007, while the Greenpoint Contamination Litigation was still ongoing, ExxonMobil responded that it was "willing to assume BP's defense and indemnify

BP, subject to [certain] terms and conditions." (ExxonMobil's Feb. 7, 2007 Letter, Dkts. 36-9, 37-14, at 2.) BP refused to accept ExxonMobil's proposal (BP's March 7, 2007 Letter, Dkt. 36-10, at 4), and the parties agreed to toll their claims "for failure to maintain hydraulic control pursuant to the 2004 Agreement and for reimbursement of defense costs, respectively" (Def. 56.1, Dkt. 36-1, ¶ 15). Under these circumstances, BP has failed to show by "clear, precise and unequivocal evidence," *Frain Camins & Swartchild, Inc.*, 1994 WL 174149, at *5, that ExxonMobil impliedly intended to waive its defenses to BP's tender, *Liberty Mutual Ins. Co.*, 703 N.E.2d at 441. *Cf. Royal Ins. Co. v. Process Design Assocs., Inc.*, 582 N.E.2d 1234, 1239 (Ill. App. Ct. 1991) ("If the insurer has adequately informed the insured of its election to proceed under a reservation of rights, and the insured accepts the insurer's tender of defense counsel, the insurer has not breached its duty of loyalty and is not estopped from asserting policy defenses.").

For the same reasons, BP's request for summary judgment on ExxonMobil's Third and Fourth affirmative defenses—that BP waived and is equitably estopped from asserting its claims—is denied. Because "reasonable minds might differ as to inferences to be drawn from" the parties' exchange of letters regarding BP's tender of defense to ExxonMobil, the issue must be decided by the jury at trial. *Wald*, 529 N.E.2d at 1148.

* * * *

In sum, ExxonMobil had a duty to defend BP in the *Baumbach* and *Spiroff* actions against all claims, with exception of claims related to contamination located under the BP Terminal and claims for remediation of the Greenpoint Contamination.

## II. ExxonMobil's Affirmative Defenses

The Court has already determined that certain claims in the Greenpoint Contamination Litigation triggered ExxonMobil's duty to defend BP, that the 2004 Agreement did not release ExxonMobil from this duty, and that the question of whether BP waived its claims in this action

is an issue of fact for the jury.  Accordingly, the Court grants BP's request for summary judgment on ExxonMobil's First and Second affirmative defenses and denies BP's request for summary judgment on the Third and Fourth affirmative defenses.  The Court addresses the parties' arguments regarding the remaining affirmative defenses below.  Given that BP's claims in this action are premised on the 1993 Agreement, Illinois law generally applies here, although, as discussed below, the parties raise a choice-of-law issue regarding the analysis of reasonableness of BP's fees and costs.

### A.    Damages and Reasonableness of Fees and Costs

Because the Court finds that ExxonMobil's duty to defend BP did not extend to all claims asserted in the Greenpoint Contamination Litigation, there is a genuine issue of fact as to the reasonable amount of fees and costs BP had to expend in its defense against the claims that should have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement. *See Ill. Sch. Dist. Agency v. Pac. Ins. Co.*, 471 F.3d 714, 723 (7th Cir. 2006) (indemnitee "bear[s] the burden of proving the amount of costs expended in defending the" covered claim); *Ill. Sch. Dist. Agency v. Pac. Ins. Co.*, No. 02 3173 (JES), 2004 WL 5187418, at *1 (C.D. Ill. Nov. 1, 2004) ("The Court set the matter for trial to determine the amount of fees and expenses incurred by the [indemnitee] that were properly allocated to defending the [covered c]laim and the reasonableness of those fees and expenses."); *see also St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1179 (Ill. App. Ct. 1986) (holding that, at trial, "[w]here part of a loss resulted . . . from a peril not covered by insurance, the insured must show the amount of the loss that is covered by [its] policy").

The Court therefore does not address the parties' arguments regarding choice of law on this issue.  That will be resolved through motions *in limine* and/or proposed jury instructions.  Even assuming, however, that BP's choice-of-law theory is correct and the Illinois market approach

applies here, summary judgment would still be inappropriate.  While the Court may be able to presume that BP's fees were reasonable, there is a genuine issue of fact as to allocation of fees to ExxonMobil for covered claims based on its duty to defend.  *See Ill. Sch. Dist. Agency*, 2004 WL 5187418, at *5 ("A defense cost is related to the defense of a covered claim if the cost would reasonably have been incurred had the covered claim been without the other claims.").  Accordingly, BP's request for summary judgment on ExxonMobil's Fifth Affirmative Defense and ExxonMobil's request for summary judgment on BP's expectation damages are therefore denied.

### B.    Prejudgment Interest

Under Illinois law, prejudgment interest is due where there is "a debtor-creditor relationship" between the parties and "the amount due [is] 'fixed or easily computed' prior to judgment." *South Bend Lathe, Inc. v. Amsted Indus., Inc.*, 925 F.2d 1043, 1049 (7th Cir. 1991). "[A] contractual obligation is sufficient to establish a debtor-creditor relationship." *Id.* "Interest begins to accrue when the underlying attorneys' fees become liquidated, i.e. 'due and capable of exact computation.'" *Santa's Best Craft, LLC v. St. Paul Dire and Marine Ins. Co.*,  611 F.3d 339, 355 (7th Cir. 2010) (quoting *Conway v. Country Cas. Ins. Co.*, 442 N.E.2d 245, 250 (1982)). "A sum is liquidated if calculation does not require judgment, discretion, or opinion." *Id.* (internal quotation marks omitted).  "But, a good-faith defense to liability does not bar prejudgment interest if the amount is ascertainable." *Id.* "[D]amages can be easily determinable 'even where the amount due requires legal ascertainment.'" *SNA Nut Co. v. Haagen-Dasz Co., Inc.*, 302 F.3d 725, 735 (7th Cir. 2002) (quoting *Fabe v. Facer Ins. Agency, Inc.*, 773 F.2d 142, 146–47 (7th Cir. 1985) (collecting cases)).  The decision whether to award prejudgment interest is within the district court's sound discretion. *See Statewide Ins. Co. v. Houston Gen. Ins. Co.*, 920 N.E.2d 611, 624 (Ill. App. Ct. 2009).

Although the determination of BP's damages requires "legal ascertainment," the amount will be based on existing attorney billing records and is therefore easily determinable. *South Bend Lathe, Inc.*, 925 F.2d at 1049 (prejudgment interest appropriate where there is "a list of . . . attorneys' fees . . . known to the penny at the time [the debtor] incurred them."); *see also Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 519 (7th Cir. 1999) ("[MHC]'s [litigation] expenses were known and calculated at the time Medcom incurred them, justifying the award of prejudgment interest.  MHC received and paid legal bills in determinate amounts; the total could be mechanically calculated, unlike (say) damages for lost profits.").

The Court therefore denies ExxonMobil's request for summary judgment seeking denial of prejudgment interest.[18]

## C.     The Illinois Joint Tortfeasor Act ("JTCA")

The JTCA provides that "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them."  740 Ill. Comp. Stat. 100/2(a).  However, "[t]he tortfeasor who settles with a claimant [in good faith] is discharged from all liability for any contribution to any other tortfeasor."  *Id.* 100/2(d).  "The purpose of the Contribution Act is to balance the equities between all culpable parties while ensuring that plaintiffs do not receive double recovery."  *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.*, 522 F.3d 776, 783 (7th Cir. 2008).

---

[18] Moreover, even if BP were not entitled to prejudgment interest under the Illinois statute that provides for prejudgment interest, prejudgment interest likely would still be appropriate under the 1993 Agreement itself.  *See Medcom Holding Co.*, 200 F.3d at 519 ("An indemnity clause is designed to make the wronged party whole—to put it in the same position it would have occupied had the other side kept its promise. . . .  The way to make the prevailing party whole is to provide prejudgment interest at the market rate . . . .").

ExxonMobil argues that it negotiated a good-faith settlement of all claims in the *Spiroff* and *Baumbach* Actions on its own and BP's behalf and therefore extinguished any liability it might have for contribution to BP. ExxonMobil's argument is premised on its conclusion that the 1993 Agreement is a "partial indemnity" under Illinois law. Because the Court finds that the 1993 Agreement is not a "partial indemnity," the JTCA is inapplicable here. BP's request for summary judgment on ExxonMobil's Seventh affirmative defense is thus granted.

## III.    BP's Request for Declaratory Judgment

Declaratory judgment serves "no useful purpose" where a filed lawsuit "will necessarily settle the issues for which the declaratory judgment is sought." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010); *see also Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08-CV-10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) ("[D]eclaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim"); *Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*, No. 08-CV-1558 (RMB), 2009 WL 577916, at *11 (S.D.N.Y. March 2, 2009) ("Because this Court has already analyzed the parties' rights and obligations under the [contracts] in connection with Plaintiffs' breach of contract claims, a declaratory judgment on the same issues would be superfluous." (internal quotation marks and brackets omitted)).

BP argues that its declaratory judgment claim is not duplicative of its breach of contract claim because ExxonMobil's refusal to defend BP in another civil lawsuit—*Christina Auriemma and Theresa Eisenbach v. ExxonMobil Corporation, et al.*—has caused BP to continue to incur defense costs. But *Auriemma* was filed after BP commenced the present litigation and BP never sought to amend its complaint to include *Auriemma* in its allegations and claims here. BP cannot now rely on an entirely separate and never before mentioned litigation to support its claim for declaratory judgment. BP's declaratory judgment claim is therefore dismissed.

## CONCLUSION

For the reasons stated in this Memorandum and Order, the parties' cross-motions for summary judgment are granted in part and denied part.  In sum, the Court finds that:

(1) ExxonMobil had a duty to defend BP in the *Baumbach* and *Spiroff* actions against all claims, with the exception of claims related to contamination located under the BP Terminal and claims for remediation (injunctive relief) of the Greenpoint Contamination.

(2) There remain disputed issues of material fact that must be tried to a jury regarding: (a) whether BP waived and is equitably estopped from asserting its claims in this action; and (b) the reasonable amount of fees and costs BP had to expend in its defense against claims that should have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2022
Brooklyn, New York