UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
BP PRODUCTS NORTH AMERICA INC.,

                    Plaintiff,

               - against -

EXXONMOBIL CORPORATION,

                    Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-3288 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

       Plaintiff BP Products North America Inc. ("Plaintiff" or "BP") brought this breach of contract action against ExxonMobil Corp. ("Defendant" or "ExxonMobil") claiming approximately $4.3 million in fees and costs incurred by BP in defending itself against certain third-party actions brought by residents and businesses for oil spill contamination in Greenpoint, a mixed-use neighborhood in Brooklyn, New York.  BP's claims stem from the terms of a 1993 defense and indemnification agreement with ExxonMobil.  This matter was tried before a jury in October 2023, resulting in a defense verdict on the breach of contract claim.  Currently before the Court is Plaintiff's motion for a new trial pursuant to Federal Rule of Civil Procedure ("Rule") 59(a).  For the reasons set forth below, Plaintiff's motion for a new trial is denied.

## BACKGROUND[1]

### I.   Factual Background

In 1968, BP's predecessor, Amoco Oil Co. ("Amoco"), purchased a portion of a property in Greenpoint from ExxonMobil's predecessor, Mobil Oil Corp. ("Mobil"), and began operating a terminal from that property (the "BP Terminal").  *BP Prods. N. Am. Inc.*, 2022 WL 4538555, at *1. Mobil retained part "of the refinery property which it used as a petroleum bulk storage and distribution terminal" (the "ExxonMobil Terminal").  *Id.*  On May 6, 1993, Amoco and Mobil entered into an agreement as part of a settlement to resolve disputes surrounding a 1978 oil spill and related sub-surface contamination in Greenpoint.[2]  (Ex. A of Cooperman Decl., Dkt. 102-3 ("1993 Agreement"), at 1–19.)  Under the terms of the 1993 Agreement, Mobil agreed:

> [T]o defend, indemnify, and hold harmless Amoco and its Affiliates from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees), asserted by governmental or nongovernmental plaintiffs, complainants, or claimants, arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume which are *not* physically located under [the BP Terminal].

(*Id.* at 17 (emphasis added).)  Following a dispute over whether petroleum products attributable to the Mobil spill were continuing to migrate through the sub-surface under the BP Terminal, the

---

[1] The Court assumes the parties' familiarity with the underlying facts in this matter.  As such, this section provides a brief summary of the background of the case and the relevant procedural history.  (*See* Summ. J. Mem. & Order, Dkt. 43, at 2–7; *see also BP Prods. N. Am. Inc. v. ExxonMobil Corp.*, No. 19-CV-3288 (PKC) (ST), 2022 WL 4538555, at *1–4 (E.D.N.Y. Sept. 28, 2022).  Substantive evidence introduced during the trial relevant to specific issues is summarized in the Discussion section.

[2] The Coast Guard identified the oil spill in 1978 and retained an environmental consulting firm to investigate the nature of the spill.  (*See* Summ. J. Mem. & Order, Dkt. 43, at 2 & 13 n.11.) The resulting investigative report identified the BP terminal as the likely cause of the spill.  (*Id.* at 13 n.11.)

parties entered into another settlement agreement in 2004. (*See* Ex. D of Crozier Decl., Dkt. 105-4 ("2004 Agreement"), at ECF 1–27.)[3] Under the 2004 Agreement, Plaintiff and Defendant agreed to "maintain hydraulic control" on the southern and western boundaries of the BP Terminal, respectively, to prevent petroleum products "from migrating in the future onto the BP [Terminal]." (*Id.* at ECF 4.) In addition, the 2004 Agreement "remise[d], release[d,] and forever discharge[d]" ExxonMobil "of and from any and all manner of action and cause of action . . . claims and demands whatsoever, . . . whether known or unknown, which against [ExxonMobil], [BP] ever had or now have relating to . . . responsibility for remediating contamination at the Greenpoint Area[.]"[4] (*Id.* at ECF 18–19.) The 2004 Agreement also stated that "[e]xcept where amended by this Agreement, the 1993 Agreement shall remain in full force and effect." (*Id.* at ECF 19.)

Between October 2005 and April 2006, groups of Greenpoint residents, property owners, and renters (collectively, "civil plaintiffs"), sued BP and ExxonMobil for "negligent, willful, and/or wanton actions" resulting in the spill of "millions of gallons of oil and oil products . . . into the ground" and for failing "to remove the contamination which migrated and continues to migrate onto plaintiffs' properties." (*Baumbach*[5] Fifth Am. Compl., Dkt. 105-10 ("*Baumbach* Fifth Am. Compl.") ¶¶ 1–2; *see Spiroff* Am. Class Action Compl., Dkt. 105-9 ("*Spiroff* Am. Class Action

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] The "Greenpoint Area" is defined in the 2004 Agreement as the "areas where ExxonMobil formerly had its refinery operations, Newtown Creek, and areas adjacent to these areas where ExxonMobil is performing or may in the future perform remediation work," in addition to the BP Terminal and the ExxonMobil Terminal. (*Id.* at ECF 2.)

[5] The "*Baumbach*" litigation and the "*A.B. Jewels*" litigation both refer to the same case. (*See* Trial Trs., Dkt. 107–110 ("Tr.") at 335:17–25 ("Q. If you look at this, Ms. Drazdys. We saw the first plaintiff on the original complaint was somebody whose name is Baumbach, the first plaintiff here is A.B. Jewel Associates Inc. Is this the same case? A. It is.").)

Compl.") ¶¶ 1–2 (collectively, the "Greenpoint Contamination Litigation" or "underlying litigation").)  The civil plaintiffs sought damages for medical and property injuries, and injunctive relief in the form of an order compelling remediation.  (*Baumbach* Fifth Am. Compl. at 187–88, 199–201; *Spiroff* Am. Class Action Compl. at 17, 36–40.)

In 2006, when BP asked ExxonMobil to defend and indemnify BP against the civil plaintiffs in the Greenpoint Contamination Litigation, ExxonMobil responded that they would defend and indemnify BP "subject to certain specified conditions that ExxonMobil asserted were consistent with the terms of the 1993 and 2004 agreements. BP disagreed that ExxonMobil's conditions were consistent with the terms of the 1993 and 2004 agreements." (Tr. at 766: 22–767:11.)  For several years, BP and ExxonMobil separately and simultaneously defended themselves in the Greenpoint Contamination Litigation.  Between 2011 and 2013, ExxonMobil negotiated settlements of all claims in the *Spiroff* and *Baumbach* actions.  (*See Spiroff* Stipulation, Dkt. 36-12, at ECF 2; *Baumbach* Stipulation, Dkt. 36-11, at 6; Tr. at 413:20–414:1.)  In each settlement, ExxonMobil secured a full release and discharge of all claims against both ExxonMobil and BP in exchange for payments[6] made solely by ExxonMobil.  (*See* Settlement of Greenpoint Claims Ltr. Understanding, Dkt. 105-8, at ECF 4 ("[T]he Settlement Amount . . . shall be made in exchange for very broad releases that will release all defendants . . . including ExxonMobil, BP, and Roux.").)

---

[6] ExxonMobil paid $10 million in the *Spiroff* settlement and $18 million in the *Baumbach* settlement.  (*See* Tr. at 530:16–23 ("So the agreement essentially would be a payment to the [*Spiroff*] plaintiffs, and in exchange the plaintiffs would drop their lawsuit and, . . . release their claims. . . .  It's my understanding, at least according to this document, [the settlement] was $10 million.") (discussing settlements negotiated by Exxon), 533:18 (testifying that the *Baumbach* settlement was approximately "18 million, I think, in [that] range").)

## II.     Procedural History

The disagreement about ExxonMobil's duty to defend and indemnify BP in the Greenpoint Contamination Litigation gave rise to the present action.  On June 3, 2019, Plaintiff initiated this lawsuit, alleging that Defendant had breached the 1993 Agreement.  (*See* Dkt. 1.)  Plaintiff sought reimbursement of costs and expenses it accrued while defending the Greenpoint Contamination Litigation and a declaration that Defendant had a duty to reimburse BP.  (*Id.*)  Defendant first answered the Complaint on June 26, 2019, and later filed an Amended Answer on June 9, 2020. (Dkts. 8, 22.)

After engaging in discovery, the parties cross-moved for summary judgment on April 9, 2021. (Dkts. 36–37.)  The Court denied in part and granted in part the summary judgment motion on September 28, 2022.  (Summ. J. Mem. & Order, Dkt. 43, at 1, 34.)  In its summary judgment decision, the Court found that, pursuant to the 1993 Agreement and the 2004 Agreement, ExxonMobil had a duty to defend and indemnify BP in the Greenpoint Contamination Litigation against all claims brought by the civil plaintiffs, "with the exception of claims related to contamination located under the BP Terminal and claims for remediation (injunctive relief) of the Greenpoint Contamination."  (*Id.* at 34); *BP Prods. N. Am. Inc.*, 2022 WL 4538555, at *15.  The Court otherwise found that there remained disputed issues of material facts regarding: (1) whether BP had waived and was equitably estopped from asserting its claims in this action; and (2) the reasonable amount of fees and costs BP had to expend in its defense against claims that should have been defended by ExxonMobil pursuant to the parties' 1993 Agreement and 2004 Agreement. (*Id.* at 34); *BP Prods. N. Am. Inc.*, 2022 WL 4538555, at *15.

Trial was held between October 16–19, 2023.  (*See* 10/16/2023, 10/17/2023, 10/18/2023 & 10/19/2023 Min. Entries.)  Based on its summary judgment decision, the Court ruled at a motion

*in limine* hearing, (Mot. *in Limine* Hrg. Tr., Dkt. 105-1 ("MIL Hrg. Tr."), at 157:20–158:8), and subsequently instructed the jury, that:

> ExxonMobil was obligated to defend and indemnify BP for claims arising out of or otherwise relating in any way to environmental contamination associated with any portion of the Greenpoint Contamination or any dissolved substances associated with the liquid plume that were not located under the BP Terminal or that did not seek remediation by BP of any alleged contamination.

(Jury Instrs., Dkt. 94 ("Jury Instrs."), at 11.)  The Court defined these claims as "covered" claims, and all other claims as "non-covered" claims.  (*Id.*)  The Court further clarified that claims "seeking money to be paid by BP into a fund so that a party *other* than BP can engage in remediation . . . [were] *not* claims for remediation [and were therefore covered claims.]"  (*Id.* at 12.)  It was up to the jury to decide whether the civil plaintiffs in the Greenpoint Contamination Litigation "sought damages or remediation, or whether their claims were covered or non-covered." (*Id.*)  Where attorney work could have been relevant to both a noncovered and covered claim, the jury was instructed to use "sound judgment in evaluating the nature of the work . . . drawing reasonable inferences where you deem appropriate from the facts and circumstances in evidence." (*Id.* at 11.)

On October 19, 2023, the jury returned a verdict against BP, finding that BP did not prove by a preponderance of the evidence that ExxonMobil breached the 1993 Agreement, as modified, in effect, by the 2004 Agreement.  (Jury Verdict Sheet, Dkt. 95, at ECF 1.)

On November 16, 2023, Plaintiff filed a motion for a new trial.  (Mem. L. Supp. Pl.'s Mot. New Trial, Dkt. 102 ("Pl.'s Mem.").)  On January 15, 2024, Defendant filed its opposition.  (Mem. L. Opp'n Mot. New Trial, Dkt. 104 ("Def.'s Opp'n").)  The motion was fully briefed when Plaintiff filed its reply on February 5, 2024.  (Reply Mem. in Supp. of Mot., Dkt. 106 ("Reply Mem.").)

**LEGAL STANDARD**

Rule 59(a) empowers a district court to set aside a jury verdict and order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The decision whether to grant a new trial following a jury trial under Rule 59 is 'committed to the sound discretion of the trial judge.'" *Stoma v. Miller Marine Servs., Inc.*, 271 F. Supp. 2d 429, 431 (E.D.N.Y. 2003) (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)). When deciding a Rule 59(a) motion, a district court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). Jury verdicts, however, "should be disturbed with great infrequency." *Id.* "A motion for a new trial should ordinarily be denied 'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 404 (E.D.N.Y. 2014) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998)); *accord Tesser v. Bd. of Educ.*, 370 F.3d 314, 320 (2d Cir. 2004).

**DISCUSSION**

In support of its motion for new trial, Plaintiff argues that the jury's finding was against the weight of the evidence, (Pl.'s Mem. at 5–18), and that the jury instructions—specifically, the use of the word "claims"—were erroneously narrow, (*id.* at 18–20). The Court considers each of these arguments in turn.

**I.     The Weight of the Evidence**

At trial, BP had the burden of proving each of the four elements of its breach of contract cause of action by a preponderance of the evidence. (Jury Instrs. at 10.) Only two of those elements are at issue in this motion, i.e., whether BP incurred legal fees defending against covered

claims and whether ExxonMobil failed to perform its obligations under the 1993 Agreement. (Pl.'s Mem. at 5; Jury Instrs. at 10.) The verdict sheet did not ask the jury to elaborate on its findings as to each of the four elements. Instead, the jury answered "No" to only one question: "Did Plaintiff [BP] prove, by a preponderance of the evidence, that Defendant [ExxonMobil] breached the 1993 Agreement, as modified, in effect, by the 2004 Agreement (pursuant to the Court's ruling)?"[7] (Jury Verdict Sheet, Dkt. 95, at ECF 1.) For the reasons discussed below, the Court is not convinced that the jury's verdict was "seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002).

### A.     Evidence of Legal Fees BP Incurred in Defense of Covered Claims

BP first contends that the civil plaintiffs in the Greenpoint Contamination Litigation brought allegations constituting "covered claims," since the underlying complaints involved "petroleum [that] had migrated [from the BP Terminal] onto the [civil] plaintiffs' properties [i.e., not physically located under the BP Terminal]," and since each of the underlying complaints sought damages. (Pl.'s Mem. at 6; *Baumbach* Fifth Am. Compl. at 187–88, 199–201; *Spiroff* Am. Class Action Compl. at 17, 36–40.) BP then points to the trial testimony of BP former counsel Vilia Drazdys as connecting these covered claims to the approximately $4.3 million in legal fees that BP incurred. (Pl.'s Mem. at 9–10.) Attorney Drazdys testified that the relevant legal work performed for BP included the retention of an expert to determine plaintiffs' property value losses; an epidemiologist and toxicologist to medically assess the civil plaintiffs; an environmental engineer to investigate the scope of the petroleum migration, which was "directly relevant" to the

---

[7] Since the jury answered "No" to the first question, it did not need to answer the second question about causation of Plaintiff's injuries, which corresponds to the fourth element of a breach of contract claim and is not at issue in this motion. (*See* Jury Verdict Sheet, Dkt. 95, at ECF 1; Jury Instrs. at 10.)

civil plaintiffs' demand that the defendants pay money into a fund for remediation;[8] professional property appraisers and engineers to inspect the civil plaintiffs' homes; legal research on the civil plaintiffs' damages claims for petroleum migration onto their properties; and "hundreds of depositions . . . relating to [the civil] plaintiffs' damage claims." (Pl.'s Mem. at 9–10; *see also* Tr. at 414:2–416:9, 423:8–424:6, 451:16–452:13, 454:4–465:10.)

In response, Defendant points to the trial testimony of ExxonMobil's corporate representative, Reid Gettys; ExxonMobil's counsel in the underlying litigation, Michael Hall; and BP's Answer and deposition testimony in the underlying litigation, to argue that "non-covered claims and allegations permeated each individual demand" in the underlying complaints. (Def.'s Opp'n at 8; *see* Tr. at 879:1–10 (presenting Gettys' testimony that the claims sought "[r]emediation, forcing the companies to remediate"), 791:11–23 & 792:3–8 (presenting Gettys' testimony that "[e]very single claim includ[ed] a request that the parties be ordered to clean up" and "if you look at it collectively these plaintiffs restated that request, that demand, over 200 times; over 200 times they said, force the parties to clean up"), 884:9–891:15 (presenting Hall's testimony that remediation was "tied to all claims" and that civil plaintiffs were alleging failure-to-warn about the "hazardous condition under the BP property as well as migration").) Defendant further questions the credibility of Attorney Drazdys, who worked as in-house counsel for BP starting about three years into the Greenpoint Contamination Litigation, supervised outside counsel who were handling the matter, and testified, in part, to her *belief* on the work that was performed before she joined the case. (Def.'s Opp'n at 11; *see* Tr. at 427:8–14; *see also id.* at 440:1–9 (Court's instruction to the jury: "Ladies and gentlemen, . . . you may be reading statements that have a truth

---

[8] The Court once again notes that "seeking money to be paid by BP into a fund so that a party *other* than BP can engage in remediation, . . . based on the 2004 Agreement, . . . is *not* a claim for remediation" and is thus a covered claim. (Jury Instrs. at 12.)

component to them; in other words, they're stating some fact that might have occurred, that the witness says occurred.  But you're not to accept the statements for the truth of the matter, what the witness is saying happened.  But rather, the relevance is that this witness reviewed those statements and that somehow informed how she approached the billing that is at issue here.").)  Further, Defendant emphasizes that BP's billing records were "vague" and "made it impossible for the jury to ascertain the work BP's lawyers actually performed."  (*See* Def.'s Opp'n at 10–11.  *See generally* Exs. K–R of Crozier Decl., Dkts. 105-11 to 105-18 ("BP Invoices").)

Here, an examination of the billing records shows just that.  As a preliminary matter, most of BP's billing records were inconclusive as to whether the work performed could be readily attributable to a covered or non-covered claim.  BP did not use task codes, (*see* Tr. at 742:16– 743:3 (Drazdys: "On these paper invoices, [task codes] are not here.  I do not recall if they were task[] code billing in our electronic system when they made it into the system.")), and several of its time entries contained summary descriptions of activities such as "review complaint," "review expert reports," "draft memos," etc., with only a handful of explicit references to remediation or damages, (*see generally* BP Invoices, Dkts. 105-11 to 105-18).  In its reply brief, BP argues that its billing records "contain[ed] large amounts of entries analyzing or responding to expert reports" and that "ExxonMobil does not attempt to argue that these reports were relevant to claims for injunctive relief, which of course would make no sense."  (Reply Mem. at 3.)  But BP provides no further explanation as to why expert reports would not be relevant or necessary to defending against remediation claims.  Indeed, a jury could reasonably find that the expert epidemiology and toxicology reports medically assessing the civil plaintiffs, (*see* Exs. G & I of Cooperman Decl., Dkts. 102-9 & 102-11), were useful for determining the scope of the injury the civil plaintiffs

experienced, if any, as a result of the alleged contamination, and could thus be highly relevant, if not essential, to defenses against remediation claims in the underlying litigation.

Similarly, Plaintiff's argument that the home inspections it performed "could not credibly" relate to claims for remediation is unpersuasive. (*See* Reply Mem. at 3 (stating that the total fees for "hundreds of home inspections" conducted "were more than $400,000").) BP's former counsel Drazdys testified that home inspections involved the retention of "scientist[s] to look at" allegations of "vapors coming into the[] home from the contamination . . . underneath" as well as an appraiser for estimating the real estate value of the civil plaintiffs' properties. (Tr. at 452:1–13.) ExxonMobil's corporate representative Gettys, in describing the scope of remediation, explained that home inspections are often a necessary first step for investigating possible remediation of contamination. (*See id.* at 785:2–786:4 ("[Y]ou first go do testing to find out if it's there. If you discover it and it's there, you have to find out where it is, so the extent of where it is. . . . That if there is vapor[] that [is] arising from the contamination, you've got to figure out not only how to get rid of the source [of] the contamination, then you got to figure out how to remediate the vapors.").) Further, the settlement in the *Baumbach* lawsuit explicitly provided for vapor mitigation and remediation of contamination, indicating that claims for remediation were a part of the underlying litigation until the very end. (*Id.* at 805:19–806:3 (describing paragraph 8 of the *Baumbach* settlement release).)

It is true that at least one of the expert reports BP produced was explicitly dedicated to assessing the civil plaintiffs' property damages. (*See* Ex. H to Cooperman Decl., Dkt. 102-10.) The legal fees incurred for producing this report are clearly attributable to claims covered by the 1993 Agreement, since the report concerns damages claims for contamination not located under the BP terminal. A reasonable jury could have concluded, however, that a single expert report

appraising property damages, without more or clearer time entries attributable to covered claims, was overall insufficient evidence for BP to meet its burden of proof.  A party's failure to prove its claim by a preponderance of the evidence does not necessarily mean that there is no evidence in the record supporting that claim—it simply means that there is not sufficient evidence that would satisfy the relevant legal standard.

For example, a reasonable jury could have considered evidence of the fees incurred for the damages expert report, alongside other time entries for ostensibly covered claims, and weighed them against the rest of the billing records, ultimately concluding that the cumulative evidence was evenly balanced or inconclusive.[9]  "[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001); *see also Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 118 (2d Cir. 1999) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." (quoting *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994)); *Waterloo Cap. Partners, LLC v. BWX Ltd.*, No. 18-CV-6542 (RA), 2022 WL 2063762, at *18 (S.D.N.Y. June 8, 2022) (similar).  For these reasons, the jury's verdict indicating that BP did not prove this element by a preponderance of the evidence was not a "miscarriage of justice."  And aside from the billing records, the remaining evidence at trial rested on the relative credibility of the parties' respective witnesses, particularly that of BP's witness

---

[9] For these reasons, the Court similarly rejects Plaintiff's argument that the jury's answer to the first verdict was "literally impossible" and that "the jury's answer . . . necessarily meant that the jury found that BP incurred no fees related to covered claims."  (Pl.'s Mem. at 17; *see also* Reply Mem. at 2.)  Once again, this is incorrect.  A jury verdict against Plaintiff means that Plaintiff failed to prove by a *preponderance* of the evidence that the legal fees it incurred were for covered claims.  This may include situations where the evidence regarding what work was performed for what type of claim is evenly balanced or inconclusive, with some evidence supporting each side.

Attorney Drazdys.  If "[the jury's] finding turned to a large extent on the credibility of [one] witness[] who testified before the jury, the finding and the verdict which followed are particularly ill-suited to after-the-fact second guessing." *ING Glob. v. UPS Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014).

BP further argues that there is "virtually no evidence" that it incurred any fees defending against "a motion for injunctive relief," implying that all of its fees must therefore be attributable to claims for damages rather than remediation.  (Pl.'s Mem. at 12.)  Whether or not BP defended against a motion for an injunction in the underlying litigation is irrelevant to this analysis. Defendant does not dispute that a motion for an injunction was never filed in the underlying action. Indeed, BP attempts to conflate a *motion* for an injunction with injunctive relief *generally*.  As the Court found in its summary judgment decision, the underlying complaints in the Greenpoint Contamination Litigation sought injunctive relief even though the civil plaintiffs did not separately move for an injunction during the litigation.  (*See* Summ. J. Mem. & Order, Dkt. 43, at 20 ("BP's assertion that the Greenpoint Contamination Litigation did not seek injunctive relief is plainly incorrect."); *see also* Tr. at 894:24–895:3, 897:23–898:4 (testimony of ExxonMobil witness Michael Hall stating that while the civil plaintiffs in the Greenpoint Contamination Litigation could have moved for an injunction, they did not).)  Plaintiff maintains that injunctive relief was unnecessary because "ExxonMobil and BP were already obligated to remediate the Greenpoint area pursuant to Orders on Consent that they had signed with the New York State Department of Environmental Conservation."  (Pl.'s Mem. at 12.)  But the existence of a consent order does not mean that the civil plaintiffs could not still seek remediation in the Greenpoint Contamination Litigation.  (*See, e.g.*, Tr. at 733:14–16 ("Q: Well, just because the DEC orders BP to clean up

petroleum under its own property, that doesn't mean that the plaintiffs can't allege that BP failed to do it, right?  [Drazdys] A: Sure, they can allege anything, sure.").)

Lastly, in the present action, even if the jury found that BP had incurred fees in defending against covered claims, there were other decisional points at which the jury could still have found against BP.  For example, the jury could have concluded that BP did not prove by a preponderance of the evidence that ExxonMobil failed to perform its obligations under the 1993 Agreement because ExxonMobil, in fact, defended both companies—despite BP deciding to litigate separately on its own—in the underlying litigation.  Defendant argues as much in its opposition papers, (*see* Def.'s Opp'n at 12–14), and Plaintiff does not directly respond to this argument.  Defendant points to testimony by Gettys that ExxonMobil *did* defend BP against covered claims in the underlying litigation, resulting in attorney fees that were "at least twice of what [BP's] attorney fees were." (*See* Tr. at 871:6–24.)  Defendant also highlights testimony by Hall (the attorney who represented ExxonMobil in the underlying action), that ExxonMobil "took the lead in defending" against all claims, including covered claims, in the underlying litigation, (*id.* at 892:12–14), and ultimately secured a release of all claims when settling the underlying litigation, (*see* Def.'s Opp'n at 8; *see also* Settlement of Greenpoint Claims Ltr. Understanding, Dkt. 105-8, at 11, 12).  Based on the entire evidentiary record, a reasonable jury could have concluded that ExxonMobil performed its obligations to defend BP against the covered claims in the underlying litigation by incorporating those claims into its own defense and relying on its own lawyers to defend both companies in that litigation, and that requiring ExxonMobil to pay for fees incurred by BP's lawyers for defending against the same exact claims would have been "duplicative" and thus not required by the 1993 Agreement.  (*See* Def.'s Opp'n at 13.)

**B.    Defendant's Use of the Phrase "Claims Related to Contamination Located Under the BP Terminal"**

Plaintiff contends that Defendant's use of the phrase "[claims] related to contamination located under the BP Terminal" (referring to "claims" made in the Greenpoint Contamination Litigation), allowed it to expand the breadth of what should be considered a non-covered claim. (Pl.'s Mem. at 15–17.)  This issue was the subject of *in limine* motions and a hearing, where Defendant's counsel sought to use this phrase to argue that claims "directed at contamination located under the BP [T]erminal . . . [such as] the premises liability [claims], the failure to warn [claims]" were non-covered claims.  (*See* MIL Hrg. Tr. at 116:18–117:10.)  The Court considered this question in some depth and ultimately allowed Defendant to make this argument at trial and for Plaintiff to make its own counterarguments.  (*Id.* at 119:15–120:5.)

At trial, Defendant's counsel employed this phrase—"claims related to contamination located under the BP Terminal"—in his opening, stating that the Greenpoint Contamination Litigation "asserted numerous claims, including non-covered claims related to contamination located under the BP Terminal, such as claims for premises liability, failure to warn, and deceptive business practices." (*See, e.g.*, Tr. at 244:2–6.)  Then, following an objection to a witness's testimony, the Court held a sidebar conference, where Plaintiff's counsel once again alleged that Defendant was attempting to use this phrase to suggest that "if a claim may have been for off-site contamination, . . . [and] relates to the BP Terminal, then it's not covered." (*See id.* at 308:13–19.)  Defense counsel disputed this characterization, emphasizing once again that this phrase was simply meant to capture claims about contamination located under the BP Terminal, such as premises liability and failure-to-warn claims.  (*Id.* at 309:4–10.)  The Court allowed defense counsel to proceed with this argument, indicating that Plaintiff was free to rebut the argument by explaining to the jury that failure-to-warn claims and premises liability claims "necessarily are

15

covered [claims] because they relate to the contamination into . . . the [civil] plaintiffs' own premises." (*Id.* at 312:2–16.) The same dispute later resurfaced during the jury charge conference. This time, the Court agreed with Plaintiff's concern and subsequently removed the phrase "claims related to contamination that was located in the BP Terminal" from the jury instructions. (*Id.* at 666:10–15, 669:9–22.)[10] Nevertheless, the Court maintained that it did not believe that the use of this phrase at trial materially impacted the jury's understanding of the case, nor that the parties had argued anything they should not have. (*Id.* at 667:13–25.) Accordingly, Defendant now argues that "[a]ny 'confusion' BP suggests that ExxonMobil created was, in effect, remedied when BP got the very instruction it wanted on this issue" at the jury charge conference and in the jury instructions. (Def.'s Opp'n at 15; *see* Jury Instrs. at 10–11.)

Challenges to arguments by counsel are subject only to deferential review. *Harewood*, 64 F. Supp. 3d at 404 (citing *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006)). The Court's opinion on this dispute has not changed. Defendants used the disputed phrase "claims related to contamination located under the BP Terminal" at trial only when eliciting testimony about the purportedly non-covered claims of premises liability, failure-to-warn, and unfair business practices. (*See* Tr. at 777:11–18, 797:16–797:20 (asking Gettys about claims "such as premises liability and failure to warn"), 888:5–15 (asking Hall about the premises liability claim).) The Court held at multiple points during the trial, and continues to believe, that this question fell within

---

[10] In sum and substance, the dispute was about whether the phrase in the jury instructions, "claims related to contamination located under the BP Terminal," would mislead the jury into thinking that claims based on contamination that originated under the BP Terminal but then migrated to the civil plaintiffs' property were non-covered claims. (*Id*. at 667:20–25 (The Court: "I think, however, Mr. Cooperman is right, that the word[s] 'claims related to contamination located under the BP Terminal' could be misread to even include contamination that migrates from underneath the BP Terminal, which we all agree could be included, except to the extent that it relates to remediation claims.").)

the scope of what could be reasonably argued either way before the jury.  Defendant was free to argue that premises liability and failure-to-warn claims pertained to contamination located under the BP Terminal itself and should therefore be considered *non-covered* claims.  At the same time, Plaintiff was free to argue that such claims were necessarily *covered* claims because the contamination had to migrate onto the civil plaintiffs' properties for there to be any damages alleged by those plaintiffs in the first place.  In any case, "a party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as '[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'" *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 271 (2d Cir. 1999)).  The Court therefore does not find that use of the phrase "claims related to contamination located under the BP Terminal" resulted in a miscarriage of justice warranting a new trial.

## II.     Jury Instruction Regarding Scope of ExxonMobil's Indemnification Duty

Plaintiff argues that "[t]he Court's jury instructions relevant to the first Jury Verdict Sheet question erred by focusing solely on whether BP 'incurred legal fees in its defense of <u>claims</u>' . . . when the unambiguous contract provision in the 1993 Agreement was far broader." (Pl.'s Mem. at 18 (quoting Tr. at 1070:10–15).)[11]  Reciting the provision in the 1993 Agreement that obligates ExxonMobil to defend and indemnify BP "from and against any and all claims, losses, demands, penalties, bonds, liabilities, settlements, damages, costs or expenses (including any attorney's fees)," Plaintiff asserts that the Court's instructions improperly narrowed the text

---

[11] The full sentence in the jury instructions read: "With respect to the second element, you must determine whether BP has proved, by a preponderance of the evidence, that it incurred legal fees in its defense against claims that should have been defended by ExxonMobil pursuant to the 1993 Agreement, as modified, in effect, by the 2004 Agreement."  (Jury Instrs. at 10.)

of the 1993 Agreement by not including in the jury charge the Agreement's reference to "costs or expenses (including any attorney's fees)." (*Id.* at 18–19 (emphasis omitted).) Plaintiff further suggests that it was entitled to recover costs and expenses even if they were unrelated to defending against the claims in the Greenpoint Contamination Litigation. (*Id.* at 18 ("And by only mentioning 'claims,' the jury was led to believe that what was at issue was only the allegations made by the civil plaintiffs, as opposed to the costs and expenses incurred by BP."); *see also* Tr. at 916:22–25 ("[Counsel for Plaintiff:] So the concern that we have is [using only "claims" instead of the full provision of the 1993 Agreement] means that folks, the jury, will look just at claims in a complaint and make a decision about covered versus noncovered, where what we bargained for was broader than that.").)[12] Plaintiff is wrong on all counts.

"[A] jury instruction will be deemed adequate, so long as the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016) (alteration in original) (quoting *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 998 (2d Cir. 1991)). An instruction can be considered erroneous where it confuses the jury's understanding of the proper legal standard or does not "adequately inform the jury of the law." *Hester v. BIC Corp.*, 225 F.3d 178, 186 (2d Cir. 2000). If the instruction, viewed as a whole, is

---

[12] During the charge conference, Plaintiff also argued that using only the word "claims" would result in the jury disregarding any evidence beyond the text of the complaints themselves. (*See* Tr. at 921:25–922:5 ("[Counsel for Plaintiff:] [T]he point we want to make here [is that] . . . a jury can just say all I need to do is look at the complaint, stop, and if there's a noncovered claim, end of story. That's not the way this provision reads."); *see also id.* at 923:1–9 ("[W]e had Ms. Drazdys talk not just about the complaints that were filed, but . . . [also] depositions and expert reports and property inspections and the like. So our point is it would be misleading for the jury to come out of these instructions saying I just need to look at the complaint, full stop.").) The Court rejected this argument, stating that the jury was "going to be instructed that they should consider all the relevant evidence, and both sides put on witnesses who testified at length about the nature of the claims and the work." (*Id.* at 923:11–14.)

correct, then it "will not be disturbed." *Stern v. Shammas*, No. 12-CV-5210 (NGG) (RER), 2015 WL 6440647, at \*7 (E.D.N.Y. Oct. 21, 2015), *aff'd sub nom. Stern v. City of New York*, 665 F. App'x 27 (2d Cir. 2016) (summary order).

Plaintiff is seeking to relitigate an issue that the Court resolved in its summary judgment decision prior to trial. There, the Court held that the 2004 Agreement had a modifying effect on Defendant's duty pursuant to the 1993 Agreement to indemnify BP's legal fees: cabining that duty to "all claims, with the exception of claims related to contamination located under the BP Terminal and claims for remediation (injunctive relief) of the Greenpoint Contamination." (Summ. J. Mem. & Order, Dkt. 43, at 34.) Though the Court entertained Plaintiff's concerns at considerable length during the charge conference, (*see* Tr. at 916:15–933:17), it ultimately concluded that using the broader language of the 1993 Agreement would "ignore[] the effect of the 2004 [A]greement which limited . . . implicitly the fees that [BP] could get reimbursement for to [those] claims that are not remedial," (*id.* at 931:8–11). As the Court explained then, and reiterates now, there "has to be an analysis of the claims first and then the attorney's fees related to those claims." (*Id.* at 931:11–12.)

For the same reasons, the Court rejected yet another of Plaintiff's requests to instruct the jury to consider both the "claims" and other "substantive work done" by BP's lawyers in determining whether the civil plaintiffs sought damages or remediation.[13] (Pl.'s Mem. at 19 (quoting Tr. at 674:7–24).) The Court denied this request, explaining, that "[t]he question is whether or not the work [BP] did was addressing the claims that were brought, and that is to be

---

[13] Plaintiff's request pertained to the following sentence of the final jury instructions: "In determining whether the plaintiffs in the Greenpoint Contamination Litigation sought damages or remediation, or whether their claims were covered or non-covered, you may consider the claims and allegations in the complaints in those cases." (Jury Instrs. at 12.)

19

determined based on the litigation that [the parties have] been allowed to introduce at some length and . . . the complaints [the parties have] been allowed to introduce and the claims and allegations in those complaints."  (Tr. at 676:14–20.)

Thus, the Court fundamentally disagrees with Plaintiff that, after the 2004 Agreement, BP was entitled to be reimbursed by ExxonMobil for any and all costs and attorneys' fees incurred in the underlying litigation, even if unrelated to covered claims.  It was therefore proper for the jury to be instructed to only consider "the parties' respective rights and obligations through the lens of what the underlying [litigation] [p]laintiffs had alleged."  (Def.'s Opp'n at 5.)  As the Court explained during the charge conference, "once you have the 2004 [A]greement, the only way to make sense of the two agreements in tandem is to require that the work [was] done on claims that are covered[,] and now that doesn't include any more claims for remedial relief."  (Tr. at 930:16–20.)[14]

Accordingly, because the Court's instructions to the jury adequately informed them of the law, no new trial is warranted.

---

[14] To the extent that Plaintiff is arguing that because the Court's jury instructions referred only to "claims" and not "costs and attorneys' fees," the jury was misled into thinking that BP was not entitled to reimbursement of its costs and attorneys' fees, that argument is completely belied by the entire record.  It was abundantly clear from the jury instructions, and from the contents of the trial itself, that this action was all about BP recouping attorneys' fees and costs it incurred defending itself in the Greenpoint Contamination Litigation.

**CONCLUSION**

For the reasons set forth above, the Court finds that the jury's verdict was not against the weight of the evidence and the jury instructions were not erroneously narrow.  Accordingly, the Court denies Plaintiff's motion for a new trial pursuant to Rule 59(a).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 30, 2024
        Brooklyn, New York

21